[Cite as *State v. Williams*, 2018-Ohio-1992.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. John W. Wise, P. J.<br>Hon. W. Scott Gwin, J.<br>Hon. Craig R. Baldwin, J. |
|     Plaintiff-Appellee | |
| -vs- | |
| | Case No. 2017 CA 00078 |
| GREGORY WILLIAMS | |
|     Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:      Criminal Appeal from the Court of Common Pleas, Case No. 2017 CR 00066

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      May 21, 2018

APPEARANCES:

For Plaintiff-Appellee

JOHN D. FERRERO
PROSECUTING ATTORNEY
KATHLEEN O. TATARSKY
ASSISTANT PROSECUTOR
110 Central Plaza South, Suite 510
Canton, Ohio 44702

For Defendant-Appellant

MARY G. WARLOP
ABNEY LAW OFFICE, LLC
116 Cleveland Avenue
Suite 500
Canton, Ohio 44702

*Wise, P. J.*

{¶1} Defendant-Appellant Gregory D. Williams appeals his conviction for rape in the Court of Common Pleas, Stark County. Appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.

{¶2} On October 19, 2016, the twelve-year-old female victim in this case (hereinafter "child victim") was living with her mother and her siblings in a house just outside the city limits of Canton. Appellant is her father, who apparently lived periodically in the house. That evening the child victim went to bed, wearing a shirt and a pair of pajama shorts. She was a heavy sleeper and kept the door closed on this occasion.

{¶3} Later that night, the child victim's older brother let appellant inside the house after he was awakened by knocking at one of the exterior doors. The older brother then went back to bed.

{¶4} At some point after midnight on October 20, 2016, the child victim woke up after hearing her mother, T.J., yelling at appellant. The girl realized her pajama shorts were on the floor, but she had no memory of anything unusual occurring prior to her waking up, although she later reported that her stomach hurt. Her parents continued arguing, and eventually her grandmother came and picked up her and her siblings.

{¶5} The mother, T.J., later recalled that on the night in question she realized appellant had entered the house, and at some point she went to check on her children. When she entered the child victim's bedroom, she observed appellant with his shorts down and the girl without clothing. She also saw appellant rubbing his penis on the child victim's buttocks, however, she did not see appellant vaginally or anally penetrate the girl. T.J. then started screaming at him. Appellant eventually left the premises.

**{¶6}** Deputies from the Stark County Sheriff's Department were then dispatched to the scene.[1]

**{¶7}** The child victim, after initially being taken to Aultman Hospital, was transferred to Akron Children's Hospital on October 20, 2016 for treatment and evaluation, at which time she was examined by Dr. Lindsay Kahlenberg, an expert in the field of pediatric emergency medicine. Dr. Kahlenberg also spoke with the mother, but she was not able to interview the girl, who didn't want to talk and remained quiet during the examination process.

**{¶8}** On January 17, 2017, appellant was indicted by the Stark County Grand Jury on one count of rape, R.C. 2907.02(A)(1)(b). He subsequently entered a plea of not guilty.

**{¶9}** Appellant thereafter rejected a plea offer, and the matter proceeded to a jury trial on April 11, 2017. As further analyzed *infra*, among the State's witnesses were Dr. Kahlenberg and three specialists from the Ohio Bureau of Criminal Identification and Investigation (hereinafter "BCI"), one of whom testified via a Skype connection. After the State had presented its case, appellant unsuccessfully moved for acquittal. No defense witnesses were called.

---

[1]   During opening statements, appellant's trial counsel told the jury that appellant had indeed committed a crime on the night in question, but that it was not rape. *See* Tr. at 165. Based on this and the rather narrow focus of appellant's present brief, we will seek to limit our recitation and discussion of the deputies' investigation in the interest of judicial economy.

{¶10} The jury was instructed by the trial court on the crime of rape and the crime of gross sexual imposition.[2] The jury thereafter found appellant guilty of rape of a child under the age of thirteen and guilty of gross sexual imposition.

{¶11} The next day, the trial court conducted a sentencing hearing. The offense of gross sexual imposition was merged with the offense of rape, and appellant received a term of life in prison. He was also declared a Tier III sexual offender. *See* Judgment Entry, April 20, 2017.

{¶12} On May 11, 2017, appellant filed a notice of appeal. He herein raises the following sole Assignment of Error:

{¶13} "I.   THE JURY'S FINDING OF GUILT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

I.

{¶14} In his sole Assignment of Error, appellant argues his conviction for rape was not supported by sufficient evidence. We disagree.

{¶15} In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. It is well-established that the State bears the burden of

---

[2]   We also note appellant's trial counsel stated the following in closing arguments: "And is it his DNA? Sure. Ladies and gentlemen, I'm not here to tell you he's not guilty. I told you from the beginning, he's guilty, but he's guilty of gross sexual imposition." Tr. at 405. The parties' briefs do not explore whether or not this constituted a stipulation to the scientific evidence upon which we should rely for purposes of our "sufficiency of the evidence" analysis.

establishing each and every element of a charged crime and must do so with proof beyond a reasonable doubt. *See In re L.R.*, 8th Dist. Cuyahoga No. 93356, 2010-Ohio-15, ¶ 11.

{¶16} R.C. 2907.02(A)(1)(b) states: "No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when *** [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶17} Furthermore, R.C. 2907.01(A) states as follows: " 'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶18} "Penetration of the vaginal cavity requires introduction of an object from without, which necessarily implies some forceful spreading of the labia majora. The penetration need only be 'slight.' R.C. 2907.01(A). Therefore, if the object is introduced with sufficient force to cause the labia majora to spread, penetration has occurred." *State v. Farr*, 3rd Dist. Seneca No. 13-06-16, 2007-Ohio-3136, ¶ 17 (additional citations omitted).[3]

---

[3]  Notably, by amendment effective Aug. 3, 2006, the General Assembly modified the definition of "sexual conduct" in R.C. 2907.01(A) by substituting the word "opening" for the word "cavity" after the phrase "vaginal or anal." *See State v. Strong*, 1st Dist. Hamilton No. C-100484, 2011-Ohio-4947, ¶ 52.

**{¶19}** The record in the case *sub judice* reveals Sergeant William Konic of the Stark County Sheriff's Department testified that as part of his investigation he spoke *inter alia* with T.J., the child victim's mother, and obtained information that appellant had gone into the bedroom and "sexually assaulted" the girl. Tr. at 229. But Sgt. Konic also noted that although appellant admitted that he had been in the child victim's bed with her, he denied engaging in any sexual conduct or activity. Tr. at 230-231.

**{¶20}** The record also indicates the State called Dr. Lindsay Kahlenberg as its expert in pediatric emergency medicine. Dr. Kahlenberg, with the aid of a diagram to assist the jury, testified that she took four perianal swab samples and four vaginal area swab samples from the child victim. Specifically, Dr. Kahlenberg testified that she took the vaginal area swabs from the child victim after she pulled apart the girl's labia. The doctor explained that "*** the labia are marked on here so if you follow those in, those are pulled apart and it's *from inside*. So it'd be -- the best on this diagram would probably be right in this area for the vaginal (indicating), it's not up -- not up near the top. Typically, the less sensitive areas just to do this posterior part. *So it is inside.* For women, I would describe it as if they go to insert a tampon, it would be in that area, but not the whole way in, but it does -- we do kind of swab to the edge there. ***." Tr. at 290 (emphasis added).

**{¶21}** Dr. Kahlenberg continued by explaining that "*** the skin is pulled kind of -- the lips or the labia are pulled and it's *just inside* ***." Tr. at 291 (emphasis added). However, she added that "*** we don't go actually into what you would actually consider the entrance to the vagina." *Id.* She also answered hypothetically on cross-examination

that if something in fluid form were to be found with this type of swabbing, she "wouldn't be able to tell you how the fluid got there." Tr. at 306.

**{¶22}** The State next called Lindsey Pruneski, a BCI analyst, who conducted an examination of the sexual assault kit obtained in the instant case. Her finding as to the vaginal samples was "a presumptive positive for seminal fluid, no sperm identified." Tr. at 316. Her finding as to the perianal samples, however, was "no semen identified." Tr. at 318. She also tested the child victim's shorts, which resulted in "no semen identified and amylase identified." Tr. at 319. As part of her protocol, Pruneski then forwarded the various samples and a portion of the victim's shorts for DNA analysis by a different unit within BCI. *See* Tr. at 318-320.

**{¶23}** The State also called Lynda Eveleth, a BCI analyst specializing in the area of DNA. Eveleth's conclusion in regard to the vaginal swabs was "mixture detected," consistent with the child victim as a contributor. Tr. at 334. She also detected a "male DNA type," but it was "not sufficient for comparison." *Id.* Her conclusion in regard to the perianal swabs was "mixture" detected, consistent with the child victim as a contributor. Tr. at 335. She also detected a "male DNA type," but it was "not sufficient for inclusion." *Id.*

**{¶24}** Eveleth then testified concerning a second report, issued December 1, 2016, which included a comparison to appellant's DNA. Regarding the vaginal swabs, the child victim was included as a contributor. Additional data was obtained that included a male DNA type, not sufficient for comparison. Appellant's sample was excluded as a "major contributor." *See* Tr. at 338. Regarding the perianal swabs, the child victim was included as a contributor, and this was consistent with the major DNA profile. Additional

data was obtained that included the male DNA type, but it was not sufficient for inclusion. Tr. at 339. Appellant was excluded as the major contributor and he was inconclusive as a minor contributor. Tr. at 340. There was not enough DNA present from the minor contributor to make a conclusion regarding him being excluded or included. *Id.* Finally, regarding the analysis of the crotch area of the child victim's shorts, the DNA testing indicated that there was a mixture detected, consistent with the child victim as a contributor and consistent with appellant as a contributor. Tr. at 341. Also, the DNA testing of the swab taken from the shorts revealed a mixture consistent with the child victim as a contributor and appellant as a contributor. Tr. at 342.

{¶25} The final witness from BCI was Hallie Dreyer, who specializes in male-specific DNA testing known as Y-STR testing. Tr. at 363. Dreyer testified that this type of testing focuses on areas that are on the Y chromosome. Tr. at 366. Also, this testing does not uniquely identify an individual, but it "can potentially link to a paternal lineage." *Id.* In other words, the results of this testing do not enable one "to say it's one male and only one male." *Id.* Dreyer noted that it is appropriate to do Y-STR testing in situations where there is going to be a large amount of female DNA in the samples that can potentially mask any foreign DNA. Tr. at 367.

{¶26} Regarding the vaginal samples, Dreyer testified that using Y-STR testing, she obtained a single male profile that was consistent with appellant. Tr. at 369-370. Neither appellant nor any of his paternal male relatives could be eliminated as the source of this profile. Tr. at 370. From the vaginal samples, Dreyer found "a full Y-STR profile in the nonsperm fraction, and a partial Y-STR profile in the sperm fraction, both consistent

with Mr. Williams." *Id.* Her findings were at a rarity of 1 in 621, which she noted was the highest statistic obtainable using this type of testing. Tr. at 372.

{¶27} Regarding the perianal sample, Dreyer testified that she also obtained a single male profile that was consistent with appellant. Neither appellant nor any of his paternal male relatives could be eliminated as the source of this profile. Tr. at 371. Her findings were again at a rarity of 1 in 621. *Id.* However, no sperm fraction was found in the perianal samples. *Id.*

{¶28} Defense counsel had no questions for Dreyer on cross-examination. *See* Tr. at 373.

{¶29} In his present brief, appellant continues to emphasize that Dr. Kahlenberg "admitted that fluid could travel from the buttocks area to the vaginal area." Appellant's Brief at 11. However, we find the impact of this defense theory would have been significantly diminished by the doctor's testimony that a "black light" examination of the child victim's front and back revealed no external bodily fluids. *See* Tr. at 284. Likewise, appellant points out that Dr. Kahlenberg saw no evidence of trauma in the child victim's vaginal area. Tr. at 292. However, the doctor opined that "we don't see [trauma evidence] as much as people would think" in cases of alleged sexual assault on a child. Tr. at 293.

{¶30} In sum, the jury heard Dr. Kahlenberg's testimony that she obtained the vaginal swab samples by pulling apart the labia on the child victim's genitalia. This ultimately resulted *inter alia* in the BCI's Y-STR test results connecting appellant to the samples. Upon review, considering the evidence in a light most favorable to the prosecution, we conclude the jury could have made the reasonable inference that appellant at minimum inserted his penis into his daughter's vagina via a separation of

the outer lips. Even if appellant was not shown to have placed his penis deep inside the child victim's vagina, this does not eliminate a finding of penetration under the Ohio statutory definition. Given the testimony at trial, the jury could have properly determined that appellant at least slightly penetrated the girl's vaginal opening past the labia majora.

**{¶31}** Accordingly, as summarized above, upon review of the record and transcript in a light most favorable to the prosecution, we find that reasonable jurors could have found appellant guilty beyond a reasonable doubt of the offense of rape as charged.

**{¶32}** Appellant's sole Assignment of Error is therefore overruled.

**{¶33}** For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Stark County, Ohio, is hereby affirmed.

By: Wise, P. J.

Gwin, J., and

Baldwin, J., concur.

JWW/d 0509